**LAIE K. MATAUTIA, Plaintiff**

**v.**

**POGISA TUIOLEMOTO, as Administrator of the ESTATE OF TUIVETA MISA, and AMERICAN GOVERNMENT, and Defendants**

High Court of American Samoa
Land and Titles Division

LT No. 56-92

April 1, 1999

Before RICHMOND, Associate Justice, TAUANU'U, Chief Associate Judge, and SAGAPOLUTELE, Associate Judge.

Counsel: For Plaintiff, Gata E. Gurr
For Defendant Pogisa Tuiolemoto, as Administrator of the Estate of Tuiveta Misa, Arthur Ripley, Jr.
For Defendant American Samoa Government, Cheryl Crenwelge-Siofle, Assistant Attorney General

## OPINION AND ORDER

On November 24, 1992, plaintiff Laie K. Matautia ("Laie") brought this action against Tuiveta Misa ("Tuiveta") to quiet title to certain land within the boundaries of the Fitiuta Airport as the Laie family's communal land; to permanently enjoin Tuiveta from claiming rental payments by defendant American Samoa Government ("ASG") for and signing any legal documents involving the land; to preliminarily enjoin ASG from releasing any rental payments for the land to Tuiveta, and Tuiveta from receiving and using any such payments; and to establish a trust account for the accrued rental payments. On December 21, 1992, we denied the preliminary injunction but ordered ASG to deposit accrued rentals with the clerk of courts to be held in an interest-bearing escrow account pending judicial resolution of the underlying issue of the title to the land. Trial was conducted on December 17 and 18, 1998. Laie, Pogisa, their respective counsel, and ASG's counsel were present.

## Discussion

### A. Parties to the Action

Tuiveta died on August 23, 1997, at age 79 years, a fact that first appeared of record in this action on May 14, 1998 during the hearing on Laie's motion to set the trial date. Laie's claim was not extinguished by Tuiveta's death and thus, 'pursuant to A.S.C.A. § 43.5002, this action and Tuiveta's defense survived his death. However, none of Tuiveta's successors or representatives, or Laie, or ASG invoked the process set forth in T.C.R.C.P. 25(a) for the substitution of parties upon a party's death or dismissal of the action as to the deceased party.[1] The trial went forward and concluded without any mention of this issue. All interested entities were afforded full and fair opportunity to litigate the issues. Thus, we think that it is more important and appropriate to presently decide the issues involved, both private and public, on the merits rather than to postpone their resolution on a procedural technicality. Accordingly, we allow, *sua sponte,* this action to continue against Pogisa, as the Administrator of the Estate of Tuiveta Misa ("the Estate"), appointed on December 11, 1998, as the party defendant substituted for Tuiveta.

### B. Ownership of the Land

Two parcels of land, totaling approximately 2.625 acres, are at issue. The two parcels are located within the boundaries of the public Fitiuta Airport, designated as Lot 11 and Lot N in ASG's amended map of the airport, Drawing No. 1863 "B", in the Village of Fitiuta on the Island of Ta'u in the Manu'a Islands. Lot 11 straddles a portion of the runway. Lot N encompasses a significant portion of the road from the main road to the airport parking area and terminal.

---

[1] The court hearing the motion on May 14, 1998 properly declined to recognize Pogisa's counsel as the deceased's counsel. Eventually, on December 11, 1998, Pogisa was appointed as administrator of Tuiveta's estate and was thus enabled to become a party in Tuiveta's place in this action. However, no formal motion by any interested entity was ever made for Pogisa's substitution as a party. Perhaps counsel understood the court's ruling to mean that the only necessary step was a formal substitution of counsel for Pogisa's present counsel to replace Tuiveta's original counsel, who was ineligible to practice law when he became the Governor of American Samoa, under H.C.R. 146. The substitution of counsel was filed on July 24, 1998 and was approved on December 16, 1998 after the present court became aware of it. However, the substitution, if necessary at all, did nothing more than to merely relieve the original counsel of any remaining obligation of record in this action.

On January 5, 1988, Tuiveta leased Lot 11 to ASG. On March 8, 1991, the lease was amended to add Lot N. Lot 11 is composed of approximately 2.473 acres and Lot N embraces about 0.152 acres, a total of approximately 2.625 acres.[2] The term of the lease, as amended, is 55 years, commencing in 1987 and ending in 2042, with ASG having options to extend the lease for two additional terms of 10 years each.[3] ASG paid a total monthly rental of $262.60 for both parcels during the first five years of the lease, as amended. Under the amendment, the amount of the rent must be renegotiated for each successive five-year period.

The two issues now before the court are: (1) the ownership of Lot 11 and Lot N; and (2) the entitlement to the rents paid by ASG for those two lots. Laie is the *sa'o* ("head or senior chief") of the Laie family and claims that Lot 11 and Lot N are part of the Laie family's communal land known as "Falefasa." Although the lease and amendment state that Tuiveta is the *sa. 'o* of the Misa family, Tuiveta asserted and his daughter Pogisa maintains that the two lots are owned by the Misa family as its individually owned land known as "Maluatia." Strictly, of course, Pogisa represents the interests of the Estate.

The protagonists, Laie and Pogisa for Tuiveta, gave us their respective versions of the oral family history and traditions pertaining to Lot 11 and Lot N. Essentially, Laie told us that these lots were part of land given to the Laie family when, in time immemorial, the Fitiuta *matai* ("chiefs") divided the lands within the village as family communal lands among the families of the village. Thus, he declared that the lots are the Laie family's communal land. Pogisa, on the other hand, stated that Misa Leafu, Tuiveta's grandfather, cleared and cultivated the land encompassing these lots from virgin bush and thus became the individual owner of the land. She maintained that the land was inherited by Laie

---

[2] We are using the lot sizes given in ASG's map, Drawing 1863 "B", but note that the original lease states that Lot 11 contains approximately 2.203 acres, and the amendment to the lease states that the total area is 2.626 acres. The precise configuration and size of either lot or the total area is not presently an issue before the court to resolve.

[3] The copy of the lease in evidence does not have the actual beginning and ending dates appended. The copy of the amendment in evidence also does not include these dates. No other evidence of these dates is before us, but again we are not called upon at this time to resolve this issue. We further note that, with the two options to extend, the total prospective duration of the lease is 75 years. Leases of communal land are statutorily limited to 55 years and require the Governor's approval under A.S.C.A. § 37.0221, but once more, even if we find that the two parcels of land at issue are communal land, the application of § 37.0221 to the lease, as amended, is not now an issue before us.

Misa, Misa Leafu's son, and then by Tuiveta, Laie Misa's son, and that until the airport was constructed, only immediate Misa family members worked the land. Thus, she advocated that the lots are the Misa family's individually owned land.

■ These two versions of the title origin are diametrically opposed and based on hearsay. While we routinely admit hearsay evidence of family history and tradition on land title issues, it is inherently weaker evidence without corroboration. *See Tupuola v. Moali`itele,* 1 A.S.R.2d 80, 81 (1983). Confirming circumstances in this case preponderate in Laie's favor.

Laie and Pogisa agreed that Tuiveta was a blood member of the Laie family. The blood relationship stems from the marriage of Tuiveta's grandfather Leafu Misa to Faioa, a daughter of the Laie Alalaie. *In re Ivfatai "Laie",* 18 A.S.R.2d 35, 38 (1991) confirms the blood connection by recognizing that Tuiveta's father Laie Misa briefly held but did not register the Laie title, probably during the 1920s. Tuiveta himself further confirmed the connection when he testified in the *In re Matai Title "Laie"* trial. Tuiveta Tr. at 4-5.[4]

Laie and Pogisa also agreed that Tuiveta held the *matai* title "Tuiveta." Pogisa connected this title to the Taaga family of Fitiuta. Laie did likewise in his pleadings, *see* Complaint para. 3, but he testified that he now understands that "Tuiveta" is a lesser *matai* of the Laie family. Tuiveta testified in the *In re Matai Title "Laie"* trial that for over 30 years he held the "Tuiveta" title in the Laie family, serving Laie Aniva and Laie Taulago. Tuiveta Tr. at 17-20.[5] Under the evidence, the "Tuiveta" title belongs to the Laie family. Tuiveta held this title for many years and served the two "Laie" titleholders immediately before

---

[4] The court awarded the *matai* title "Laie" to Laie in *In re Matai Title "Laie"*. Both Laie and Tuiveta were among the several candidates vying for the "Laie" title in that *matai* title action. Hence, we take judicial notice of the court's file, MT No. 5-90, and the transcript of Tuiveta's testimony in that *matai* title controversy on this point and for other purposes discussed in this decision. *See infra* p. 6.

[5] The lease and its amendment refer to Tuiveta as the *sa`o* of the Misa family. Pogisa identified a distinct Misa family in Fitiuta headed by the holder of the "Misa" *matai* title. In his affidavit filed for the preliminary injunction hearing in this action, Tuiveta also acknowledged that there is a Misa family in Fitiuta, but he clearly stated that he signed the lease and amendment only as the head of the nuclear Misa family descending directly from Misa Leafu. Tuiveta Aff. at 1. Pogisa also pointed out that Tuiveta was a blood member of the Taaga family of Fitiuta, as well as the Laie family.

the court awarded the title in *In re Matai Title "Laie"* to Laiẹ in 1991.[6]
Lot 11 and Lot N are located within the Village of Fitiuta proper, not in the outlying areas of the village. Except for a plot within the airport leased by Tuiveta's brother to ASG, all other lands in the neighborhood are communal lands of various Fitiuta families. These families have communally owned these lands in the customary Samoan way since the very early days of the existence of the village in this area. Tuiveta's assertion that the land encompassing Lot 11 and Lot N was left idle as virgin bush until Misa Leafu claimed to own it individually by original occupancy and cultivation is incredulous. Misa Leafu was Tuiveta's grandfather and perhaps started to work the land about 150 years ago at the earliest. This event would have been long after the *matai* of Fitiuta distinguished the communal land holdings in this area among the families of Fitiuta.

■ The most reasonable explanation for Tuiveta's occupancy and cultivation of Lot 11 and Lot N is that the *sa'o* Laie Alalaie made a customary assignment of the use of the Laie family's communal land encompassing these lots to Tuiveta's grandfather Misa Leafu and/or Laie Alalaie's daughter Faioa after Misa Leafu married Faioa and into the Laie family. A customary assignment of communal land does not change the character of the land from communal land to individually owned land. *Fagasoaia v. Fanene,* 18 A.S.R.2d 72 (Land & Titles Div. 1991). Pogisa referred to events and other factors in an attempt to overcome this conclusion. The following are these considerations deserving discussion.

Pogisa recognized, as did her father Tuiveta, that the land "Falefasa" is indeed among the Laie family's communal lands and is the traditional locale of the family's *faletalimalo* ("guesthouse"). Tuiveta Tr. at 20, 26. Tuiveta also cultivated at least portions of "Falefasa." Tuiveta Tr. at 20. Pogisa and her husband Salele'a Tuiolemotu[7] identified a relatively

---

[6] We take note, however, that the court in *In re Matai Title "Laie"* found that Tuiveta did not recognize any of the three opposing candidates, and accordingly by implication Laie Aniva and Laie Taulago, as blood members of the Laië family, and that despite his professed motivation as a title candidate to unite the family, Tuiveta was strong willed and uncompromising in his attitude on this and other issues. *In re Matai Title "Laie",* 18 A.S.R.2d at 40-41.

[7] Although he was born and raised on the Island of Tutuila, Salele'a Tuiolemotu learned about lands in Fitiuta from occasional visits there with Pogisa and his employment with the right-of-way division of ASG's Department of Local Government (headed by the Secretary of Samoan Affairs) as a surveyor's assistant. He was present during the surveys of the lots within the Fitiuta airport and participated in determining the damages to be paid for the loss of crops from the airport

small rectangular area, about 100 feet by 225 feet, as "Falefasa." Lot N lies along the westerly side of this area for approximately 148 feet. The site of the Fitiuta elementary school bounds both the northerly and easterly sides of this area. Pogisa claimed that the school site was also part of the land "Maluatia." The school site and Lot N are disconnected. Thus, though the surveyed airport lots substantially vary in size and many are irregularly shaped, the school site is next to and far more logically associated with the land Pogisa identified as "Falefasa" than with an otherwise remote Lot N.

Pogisa sought to reaffirm the Misa family's individual ownership of the school site, Lot 11, and Lot N as parts of the land "Maluatia" by further declaring that, during Laie Aniva's tenure and without his objection, the Fitiuta Village Council selected and Tuiveta dedicated the original school site, and that, during Laie Taulago's tenure and without his objection, Tuiveta dedicated an area to expand the school site. Laie partially countered this point by claiming that Laie Aniva died in 1955, that the Laie title was vacant when the original dedication was made in 1959, and that Tuiveta's decision to dedicate land for the school site was acceptable within the family during the *sa`o* vacancy.

Pogisa also pointed out that Laie Taulago did not object when the airport land transactions were negotiated and consummated in 1987-1988. She further stated that Tuiveta received the damages paid by ASG for the crops on Lot 11 and Lot N lost as a result of the airport construction. On the other hand, Laie asserted that he raised the issue with Laie Taulago, first during the period of the airport surveys and again several months later. Laie claimed that Laie Taulago, who by then was enfeebled by age and ill-health, told Laie to let things be and he would call a family meeting later to resolve the matter, but Laie Taulago never did so. Thus, when Laie became the *sa`o* in 1991, he decided to follow through his objection to Tuiveta's individually owned land claim.

Laie also pointed out that while he headed operations in the Manu'a Islands for ASG's Department of Public Works, he had cinders excavated from the land "Falefasa" for road construction work with Laie Taulago's permission. Tuiveta objected and was told by Laie to take up the matter with Laie Taulago, but Tuiveta never returned to Laie and the project continued for about two months.

Pogisa's first cousin Uila Faaoso ("Uila") testified that her father Upega Misa ("Upega"), Tuiveta's brother, leased another portion of the land "Maluatia" for the airport, designated as Lot P on the amended airport map. Lot P appears to include an area that directly connects Lot 11 with the school site. Uila reiterated that the Misa family inherited "Maluatia"

---

construction.

as individually owned land by descent. She apparently understood that Tuiveta and her father informally divided the land between them during their lifetimes. Upega received the rent for Lot P until his death and Uila's sister in Fitiuta does so now. "Upega" is a *matai* title in the Moaliitele family of Fitiuta, and on the face of it, Upega owed his allegiance principally to that family rather than to the Laie family.

Laie presented three witnesses who supported his contention that Lot 11 and Lot N are portions of the Laie family's communal land "Falefasa." One was Scoupu Nua, an elderly lady, who was born and raised in Fitiuta, is a Laie family member, and still visits Fitiuta for Laie *faalavelave* ("family affairs") from her marital home in the neighboring Village of Ta`u. Another was Faaumu Tafaoa Tavaseu, who was one of the losing candidates in *In re Matai Title "Laie"*. The third was Avaoalii Ia ("Ia"), who is a member of the Galea`i family of Fitiuta. Ia also leased areas to ASG for the airport, denoted Lot 9 and Lot 0 on the amended airport map. These two lots are, respectively, immediately adjacent to Lot 11 and Lot N. Ia's father and Tuiveta also disputed land interests in the area, but Ia always believed that his father dealt with Tuiveta as a Laie family member having designated occupancy and use of the Laie family's communal land encompassing Lot 11 and Lot N. Ia identified the owners of the adjacent communal lands designated as Lot 10 and Lot 12 on the amended airport map. He understood from his father that Lot 10 is also known as "Falefasa."

We do not find any of the events and other factors cited by Pogisa persuasive as support for Tuiveta's claim that he and the Misa family own Lot 11 or Lot N individually, or Pogisa's present claim that the Estate owns these lots individually. Rather we find that these events and other factors tend to be more indicative of the longstanding and destructive rivalry and disharmony within the Laie family generally and respecting land particularly. The claim of Tuiveta, and of Pogisa on behalf of the Estate, of individual ownership of Lot 11 and Lot N is unfounded and ineffectively seeks dominion over these lots.[8] Accordingly, we conclude that Lot 11 and Lot N are part of the Laie family's communal land "Falefasa." We further conclude that Misa Leafu and/or Faioa Laie Misa, and their successors, including Tuiveta, did not acquire any distinct interest other than customarily assigned rights to possession and occupancy of these portions of the Laie family's communal land.

---

[8] We also want it clearly understood that as a matter of general principle, and under the facts of this case in particular, a member of a Samoan family cannot acquire individual title by adverse possession to the portion of the family's communal land assigned to him or her. *See Utu v. Fuata,* 17 A.S.R.2d 104 (Land & Titles Div. 1990).

## C. Entitlement to the Rent

■ In the Samoan communal land system, typically only the *sa'o* has the right to lease his family's communal lands to non-family members, and even his rights in this regard are subject to certain restrictions and limitations.[9] In arriving at this conclusion, we begin with the general rule as articulated by the court in *Sagapolutele v. Tala'i*: "It is trite law that the senior matai has *pule* or control over family lands and that in his or her capacity as the matai may assign or designate a piece of family land for the use of individual family members." 20 A.S.R.2d 16, 17 (Land & Titles Div. 1991). While leasing land to a third party could theoretically be seen as a kind of "use" of the land, the court has further defined this requirement as including "actual use *and* occupancy of such land." *Toleafoa v. Tiapula*, 7 A.S.R.2d 117, 122 (Land & Titles Div. 1988) (emphasis added). A family assignee's failure to occupy his or her assigned parcel results in relinquishment of possession and causes a reversion of the land back to the *sa'o* and family.[10] *Id.*

In cases involving leases of communal lands to non-family members, the court's holdings have been consistent with the notion that such leases may only be arranged by or with the consent of the *sa'o,* on behalf of the entire family. In *Sagapolutele,* the court held that an individual family member's lease of his assigned communal land to a third party for purposes of establishing a grocery business was a "clear attempt to usurp the matai's pule," and noted that individual family members other than the *sa'o* have "no authority to permit strangers to live on communal lands." 20 A.S.R.2d at 17, citing *Lolo v. The Heirs of Sekio,* 4 A.S.R.2d 477, 481 (Trial Div. 1964). Similarly, in *Fagasoaia v. Fanene,* the court was confronted with a defendant who had constructed a warehouse on communal lands and had leased the structure to a non-family member against the will of the *sa'o*. The court found the lease to be invalid, confirming that "[a] family member's right to live on family land does not include a right to build supermarkets, warehouses, and parking lots

---

[9] Such limitations include the general requirements that he exercise his *pule* ("power") for the benefit of family members and that he not act in an arbitrary or capricious manner with respect to land assignments or leases. *Pen v. Lavata'i, 25* A.S.R.2d 164, 168 (Land & Titles Div. 1994), *aff'd* 30 A.S.R.2d 10, 19 (App. Div. 1996).

[10] Note that intent is not a relevant factor in determining whether a family assignee has relinquished his or her rights to assigned communal land: "Relinquishment of possession may be either by voluntary surrender or by abandonment by the family member. While a family member's intentions may not have been to abandon the land, the issue of whether relinquishment has arisen and the matai has effectively taken over to the exclusion of the family member is one of fact." *Toleafoa,* 7 A.S.R. at 122.

on it and rent these out to strangers." 18 A.S.R.2d 72, 73 (Land & Titles Div. 1991).[11]

In this case, having determined that Lot 11 and Lot N are part of the Laie family's communal land "Falefasa," the lease of those lots should have been arranged with the consent of then-sa`o Laie Taulago. Furthermore, the title to these lots remains with the Laie family, and all rents from the lease should ordinarily be turned over to Laie as the·current *sa`o* for the benefit of the entire family. This case, however, presents several unique considerations which lead us to conclude that the Estate is nevertheless entitled to some portion of the rental revenues.

■ Irrespective of our conclusion that Lot 11 and Lot N are the Laie family's communal land, Tuiveta, as the family assignee in possession of these lots, took the time and effort necessary to negotiate the terms of the lease, and generally was the person responsible for facilitating the lease transactions. More importantly, however, the very nature of this lease differs significantly from the leases at issue in the cases cited *infra*. In both the *Sagapolutele* and *Fagasoaia* cases, the defendants had arranged for leases allowing non-family businesses to occupy their assigned property, deliberately attempting to turn a profit from their exploitation of the family's communal land. Here, though, the land was urgently needed by ASG for construction of the Fitiuta Airport, and Tuiveta in fact had little practical choice in the decision of whether or not to lease his assigned property. In the more typical case, the defendant assignee might have the option of canceling the lease and at least repossess his or her assigned land, but the current use of Lot 11 and Lot N is such that this course would be impractical.

In effect, therefore, the Misa family has been dispossessed from a portion of the Laie family's communal land which all parties agree that it has occupied for many years. In the best possible scenario, Tuiveta would have originally recognized Lot 11 and Lot N to be communal land, Laie Taulago would have negotiated the lease on behalf of the entire Laie family, and the Misa family would have been compensated for losing some of their assigned land, either by the assignment of other

---

[11] While it is true that in some cases individual family members have been permitted by the court to lease the use of buildings, such buildings had become the property of the individuals, rather than the family as a whole, pursuant to a legal separation agreement. *See Fagasoaia,* 18 A.S.R.2d 72. A separation agreement creates personal property rights in the building distinct from those in the land itself, which remains vested in the *sa`o* on behalf of the family. A.S.C.A. §§ 37.1501-.1506. With this exception, however, the general rule that the *sa`o* controls the distribution of the family's communal lands remains our guiding principle.

land or by receiving a portion of the rental proceeds from the lease. *See I`auloualo v. Siofaga,* 14 A.S.R.2d 26, 27-28 (Land & Titles Div. 1990) (when a family member who has done no wrong has been evicted from family communal lands he has been occupying, "it is essential that the family member be compensated by the assignment of equivalent lands"). We would now ideally return all the rent payments in escrow to Laie and leave the equitable distribution of such monies—including fair compensation to the Estate—to him as the *sa`o*.

■ However, the unfortunate history of acrimony between these parties, arising even before the title dispute recorded in *In re Matai Title "Laie",* which was filed in 1990, leads us to believe that such cooperative intrafamily processes would likely be frustrated in the near term. Any immediate compensation to the Estate must therefore be fashioned by the court. Accordingly, we will direct that, as fair and equitable compensation, two-thirds of the rent from the lease accrued as of the entry date of this order shall be paid to the Estate, and that the balance of the accrued rent and all future rent shall be paid to Laie or to his successors in the office of the Laie family *sa`o*.[12]

This provision for compensation to the Estate should be viewed merely as a safeguard of sorts and is not intended to displace the traditional family process for allocation of resources. As required both by law and Samoan custom, Laie and his successors are expected to use the rents paid to him for the benefit of the entire Laie family, including appropriate members of the Misa family, perhaps by assigning replacement communal land or by sharing the future rent payments, but at least by some other proper means. Such gesture by Laie may go a great distance towards reducing the hostility which has characterized the relationship between these parties far too long.

## Order

1. Lot 11 and Lot N are not individually owned by the Estate but are part of the Laie family's communal land "Falefasa."

2. ASG shall pay any rent for the lease of Lot 11 and Lot N due as of the entry date of this order but not yet deposited into escrow to the clerk of the court. The clerk shall pay two-thirds of all monies held in escrow to the Estate and one-third of these monies to Laie. This allocation shall include in the same ratio all interest earned on the deposited funds.

3. ASG shall pay all rent accruing after the entry date of this order to the

---

[12] Similarly, the Court in *Fagasoaia* divided lease payments to provide for a $200 per month payment to the plaintiff "as compensation for the use of land formerly occupied by him." 17 A.S.R.2d at 95.

*sa`o* of the Laie family. For this purpose, a constructive trust is imposed on all rent for the lease of Lot 11 and Lot N accruing after the entry date of this order, with ASG as the trustee and Laie or his successor *sa`o* as the beneficiary, until a new lease with Laie or his successor *sa`o* as the lessor is substituted for the existing lease.

It is so ordered.